J-A28012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.N.R., A MINOR | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.A.R., FATHER | : | No. 848 EDA 2017 |

Appeal from the Order Entered August 26, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000362-2016,
CP-51-DP-0002710-2014

BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:              **FILED NOVEMBER 22, 2017**

Appellant, O.A.R. ("Father"), appeals from the order entered in the Philadelphia County Court of Common Pleas Family Court Division, which granted the petition of the Department of Human Services ("DHS") for involuntary termination of Father's parental rights to his minor child, T.N.R. ("Child").  We affirm.

In its opinion, the Family court correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add that the court relieved prior counsel and appointed new counsel on June 9, 2017.  On June 12, 2017, Father petitioned the court to reinstate his direct appeal rights *nunc pro tunc*, which the court granted on June 15, 2017.  On June 20, 2017, Father timely filed a counseled notice of appeal *nunc pro tunc* and a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises two issues for our review:

> DID THE DEPARTMENT OF HUMAN SERVICES (DHS) SUSTAIN THE BURDEN THAT FATHER'S RIGHTS SHOULD BE TERMINATED WHEN THERE WAS EVIDENCE THAT FATHER HAD COMPLETED AND/OR HAD BEEN ACTIVELY COMPLETING [HIS] PERMANENCY GOALS?
>
> WAS THERE SUFFICIENT EVIDENCE PRESENTED TO ESTABLISH THAT IT WAS IN THE BEST INTEREST OF THE CHILD TO TERMINATE FATHER'S PARENTAL RIGHTS?

(Father's Brief at 4).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is

on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS filed a petition for the involuntary termination of Father's parental rights to Child on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or

subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to

the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the

- 5 -

parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the

petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

With respect to an incarcerated parent, this Court has stated:

> [I]ncarceration alone does not provide sufficient grounds for the termination of parental rights. Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and fails to take affirmative steps to support a parent-child relationship. As such, a parent's responsibilities are not tolled during incarceration.

*In re Adoption of K.J., supra* at 1133 (internal citations omitted).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and

welfare of the child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. ***In re C.P.***, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." ***Id.*** Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

***In re Z.P., supra*** at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…rights terminated." ***In re B.L.L.***, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties.

Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with…her physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of…her potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Joseph

Fernandes, we conclude Father's issues merit no relief. The Family court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Family Court Opinion, filed June 2, 2017, at 5-11) (finding: **(1-2)** Father has been incarcerated for about three years; caseworker visited Father in April 2016, and informed him DHS had custody of Child; Father refused visits with Child; caseworker left her contact information but Father did not contact caseworker to inquire about Child; Father admitted he did not avail himself of any programs inside prison, except for drug program, because he was preoccupied with his criminal case; Father provided no documentation about his employment opportunities once released from prison; Father admitted he is unable to parent Child due to his current situation; Child has been in custody of DHS for over twenty months; court found Father's alleged lack of knowledge that Child was in care of DHS hard to believe; Father evidenced settled purpose of relinquishing parental claims to Child by failing and refusing to perform his parental duties; Father is not in position to meet Child's safety and special needs and cannot take immediate custody of Child; Father failed to complete his objectives of making himself known to DHS, maintaining contact with caseworkers, and visiting with Child; Father has not seen Child outside of prison since she was three-months old; Child has developmental delays and cardiac issues; Child needs permanency; conditions which brought Child into care of DHS continue to exist; court properly terminated Father's parental rights under

Section 2511(a)(1) and (2); under Section 2511(b), Father claimed he last saw Child in November 2014, when Mother brought Child to visit Father in prison; Father alleged he had some contact with Child on phone after Mother stopped bringing Child to visit Father; occasional visits and phone calls are not enough to create parental bond with Child; Father does not have healthy, beneficial relationship with Child; Father is essentially "stranger" to Child; Child looks to Maternal Grandmother for love, comfort, and support; Child would suffer emotional harm if removed from Maternal Grandmother's care; record established by clear and convincing evidence that termination of Father's parental rights and change of goal to adoption and was in Child's best interests).[1]  Accordingly, we affirm based on the Family court opinion.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: _11/22/2017_

---

[1] The Family court opinion stated Father waived his issues for failure to file a Rule 1925(a)(2)(i) statement.  A review of the certified record, however, revealed that Father filed his Rule 1925(a)(2)(i) statement with his notice of appeal *nunc pro tunc* on June 20, 2017.

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

PROPROTHY

In the Interest of T. N. R., a minor        :        CP-51-DP-0002710-2014
                                            :        CP-51-AP-0000362-2016
                                            :
                                            :        51-FN-002470-2014
                                            :
APPEAL of: O. A. R., Father                 :        848 EDA 2017

**OPINION**

**Fernandes, J.:**

Appellant O. A. R. ("Father") appeals from the order entered on August 26, 2016, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to T. N.R. ("Child") pursuant to the Adoption Act, 23 Pa. C. S. A. §2511(a)(1), (2), and (b). Father filed a timely pro se Notice of Appeal without a Statement of Errors Complained of on Appeal.[1]

**Factual and Procedural Background:**

The family in this case became known to DHS on June 27, 2014, when DHS received a General Protective Services ("GPS") report alleging that Child was born prematurely at twenty-eight weeks' gestation; that Child suffered from elevated blood pressure, retinopathy of prematurity, Patent Ductus Arteriosus ("PDA"), and Ventricular Septal Defect ("VSD"); that Child's mother ("Mother") failed to attend numerous medical appointments for Child in ophthalmology, cardiology, primary care, and nephrology; that due to Child's high blood pressure, her kidneys needed to be closely monitored; and that Child's maternal grandmother ("MGM") took her to the

---

[1] Father filed a pro se Notice of Appeal on September 24, 2016, which complies with the time requirements prescribed by Pa. R. A. P. 903(a). Father filed the appeal with the Clerk's office, but due to the Clerk's office's administrative mistake, the appeal notice was filed in the dependency file and not transmitted to the appropriate Clerk's unit. Father also failed to file a concise statement of errors complained of on appeal as prescribed in Pa. R.A.P. 1925(a)(2) and served in accordance with Pa. R.A.P. 1925(b)(1). The trial court was not aware that Father had taken an appeal. Subsequently, in March 2017, Father's appeal was found, and Father's prior appointed counsel was reattached to the case on April 17, 2017. Due to delays in the filing of the Docketing Statement by Father's counsel, Superior Court issued a Rule to Show Cause order on March 15, 2017, as to whether Father's counsel had abandoned her client. The trial court issued an administrative order on May 5, 2017, that Father's counsel had not abandoned her client. On May 19, 2017, Superior Court issued an order that Father's counsel still had not filed the Docketing Statement or responded to the Rule to Show Cause order of March 15, 2017. On May 25, 2017, Father's counsel filed an untimely Docketing Statement.

Children's Hospital of Philadelphia ("CHOP") for a doctor's appointment. The report also alleged that Child weight was within normal range and she was up to date on immunizations; that it was unknown if Child's condition had worsened due to the missed medical appointments; that Child received Supplemental Security Income ("SSI"); that Child needed early intervention services; that Mother claimed to miss Child's medical appointments because of her employment, while MGM informed DHS that Mother was unemployed; that DHS attempted to visit the home and investigate the allegations of the GPS report twice at the end of June 2014; and that Mother was uncooperative with DHS and failed to make Child available so DHS could assess her safety. DHS also learned that Mother and Child began residing in a rooming house. This report was found to be valid. DHS visited MGM's home and met with the family. Mother had numerous explanations as to why she missed Child's medical appointments, but agreed to accept In-Home Services ("IHS"). On July 15, 2014, IHS were implemented by the Community Umbrella Agency ("CUA") Asociación de Puertorriqueños en Marcha ("APM"). IHS were to assist Mother with Child's medical appointments and with locating stable housing. On August 18, 2014, CUA created a Single Case Plan ("SCP") in which Father's objective was to make his whereabouts known to DHS as he was unknown to CUA.

On October 29, 2014, DHS received a Child's Protective Services ("CPS") report alleging that Child had missed three scheduled appointments at CHOP since her last primary care visit on June 27, 2014; that Child had what appeared to be a burn above her navel; Mother and MGM were notified of Child's injury, but they said they had not seen it and did not know how Child was injured. The report further alleged that Mother appeared disengaged and unconcerned with Child's well-being; that Mother was evasive; and that Child was developmentally delayed and had been referred for early intervention services. This report was unfounded. However, safety concerns for Child remained. On December 2, 2014, Child was adjudicated dependent and fully committed to DHS custody. The Trial Court ordered that a Parent Locator Search ("PLS") be submitted as to Father. On April 21, 2016, DHS filed a petition for termination of Father's parental rights and change of the permanency goal from reunification to adoption. In March 2016, Father's whereabouts became known; Father was incarcerated                for about three years. The petition for termination of parental rights was heard on August 26, 2016, at which time Child was three years of age and had been in care for twenty

months. Father was brought down from \_\_\_\_\_ and participated in the hearing while still in custody at the bar of the court. (N.T. 8/26/16, pgs. 37, 52-53).

CUA testified that she became aware of Father in April 2016 and that he was incarcerated at \_\_\_\_\_ (N.T. 8/26/16, pg. 12). Father has been incarcerated for the last three years. (N.T. 8/26/16, pg. 13). CUA visited with Father on April 25, 2016. CUA testified that when asked if he would like to have visitation with Child, Father said no. (N.T. 8/26/16, pg. 12). Father has not seen Child since she was three months old. CUA also testified that Father never reached out to her to find out about Child in any way. (N.T. 8/26/16, pgs. 13-14). CUA testified that she left Father her business card at the April visit, but Father still did not reach out to her. (N.T. 8/26/16, pg. 16).

CUA APM did not have any information on Father prior to March 2016. From the beginning of the case in December 2014 to a permanency review on February 9, 2016, a PLS had not been completed for Father's whereabouts. (N.T. 8/26/16, pgs. 23-26). Once CUA received the information about Father's whereabouts at the prison, she testified that she sent out a certified letter to the warden requesting permission to visit with Father, which was granted. (N.T. 8/26/16, pgs. 26-27). Detailed SCP objectives were not set up for Father since his identity was unknown. However, once CUA went to visit Father \_\_\_\_\_, CUA offered the goal of visits to Father, but Father refused to have visits. (N.T. 8/26/16, pgs. 27-28, 30-33). CUA also explained that Father's other goal after her visit with him was for him to maintain contact with CUA, which Father did not. (N.T. 8/26/16, pgs. 13-14, 30-31).

Father testified that in December 2014, when Child came into care, he was already incarcerated at PICC. Father testified he was in communication with Mother, but she did not tell him that Child was placed with DHS. Father did not learn that Child was placed with DHS until CUA's April 2016 visit. Father claimed that he rejected visits with Child because he expected to be released shortly after and did not think it safe for Child to visit him in prison with a third-party stranger present; he declined for safety reasons. Father testified that he last saw Child in November 2014, when Mother brought her to the prison to visit him; Mother took Child to see Father at the prison twice before that. Father testified that Mother did not tell him about Child's placement with DHS. Mother indicated to Father that her work schedule had become more hectic and that she had gotten a babysitter for Child, who was also in school. Father also testified that he wrote to Mother twice

about how Child was doing. (N.T. 8/26/16, pgs. 39-40). Father testified that he kept in contact with Mother after she stopped bringing Child to visit. (N.T. 8/26/16, pg. 48). While Child was in kinship with MGM, Father would call Mother from prison and MGM would allow Mother to put Child on the telephone to speak with Father. (N.T. 8/26/16, pg. 49, 55). Father testified he last spoke to Child in June 2016, as his cellmate was Child's maternal uncle who kept in touch with MGM from prison. (N.T. 8/26/16, pg. 51). Father claimed that he would be released the following week after the termination trial. (N.T. 8/26/16, pgs. 35-37).

At the time of the termination trial, Father was still in custody awaiting trial, which was scheduled for December 5, 2016. Father testified that he had to pay nominal bail, will be on house arrest and electronically monitored. (N.T. 8/26/16, pgs. 37-38; 42-44). Father is charged with robbery and possession of a firearm. (N.T. 8/26/16, pg. 41). During incarceration, Father worked in the law library, but was fired and rehired at least three times. Father indicated that he did not avail himself of any of the programs offered at the prison, except for a drug program, because he was preoccupied with studying his criminal case and representing himself. (N.T. 8/26/16, pg. 45-46, 50-51).

Father testified that upon release on bail he will be living with his uncle in Philadelphia. Father also testified that he will be employed at his uncle's catering business as a cook, and also has an interview scheduled at an Audi dealership. (N.T. 8/26/16, pg. 40). Father indicated that his uncle's home has three bedrooms with all utilities working and the uncle would allow Child to also live there with Father. (N.T. 8/26/16, pgs. 41-42). Father claimed that while released on bail he will be allowed to work, and with permission would be able to take Child to her medical appointments. (N.T. 8/26/16, pg. 44-45). Father admitted that he is currently unable to parent Child due to his present position. (N.T. 8/26/16, pgs. 47-48).

Child is placed in kinship with MGM through APM. (N.T. 8/26/16, pg. 9). Child also has a sibling placed with MGM. (N.T. 8/26/16, pg. 15). Child does not have a healthy parental relationship with Father. MGM indicated to CUA that Father had not seen Child since she was three months old. Child looks to MGM for daily love, care and support and as her primary caregiver. Child shares a parental bond with MGM. Child has gone on various trips to amusement parks and museums and shopping trips with MGM. MGM makes sure Child gets to all her medical appointments due to her cardiac issues and developmental delays. Child and MGM have a

nurturing and very loving relationship. CUA testified that Child would suffer emotional harm if removed from MGM's care. (N.T. 8/26/16, pgs. 10-13). Following testimony and argument, the trial court terminated Father's parental rights under 23 Pa. C. S. A. §2511(a)(1), (a)(2), and (b) and changed the goal to adoption.

**Discussion:**

Father has waived all issues not stated in a Statement of Errors Complained of on Appeal. *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006). *See also In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009); *In re C.P.*, 901 A.2d 516, 522; *In re J.E.D.*, 879 A.2d 288, 293, fn. 7 (Pa. Super. 2005). Father has not submitted a Statement of Errors Complained of on Appeal as required by the appellate rules. This appeal should be quashed. However, if the Superior Court allows Father's appeal to go forward, for the purposes of this opinion, the trial court will presume that Father is appealing the termination of his parental rights under 23 Pa. C.S.A. §2511(a)(1), (2), and (b), and the goal change.

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa. C. S. A. §2511(a), which provides the following grounds for §2511(a)(1):

(a) **General rule** – The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights, the burden of proof is on the party seeking termination which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing

evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. _In re C.R.S._, 696 A.2d 840, 843 (Pa. Super. 1997). A parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize the given resources and to take affirmative steps to support a parent-child relationship. _In re D.J.S._, 737 A.2d 283 (Pa. Super. 1999).

The petition for involuntary termination of parental rights and goal change were filed on April 21, 2016. For the six-month period prior to filing, Father was not successfully completing any SCP objectives. Father's only objectives were first to make his whereabouts known to DHS and once known to DHS to keep in contact with CUA. (N.T. 8/26/16, pgs. 13-14, 30-31). Father has been incarcerated for about three years at ___ . At the time of the termination trial, Father is still at ___ . (N.T. 8/26/16, pgs. 12-13, 52-53). Father was already incarcerated when Child came into care in December 2014. Neither Mother nor MGM informed Father that Child was in DHS custody, nor did Father ask where Child was. (N.T. 8/26/16, pg. 35). CUA visited with Father in April 2016 and informed him that Child was in DHS custody. CUA offered Father the goal of visits with Child, but Father refused. (N.T. 8/26/16, pgs. 27-28). Father claimed that he rejected visits for safety reasons as a third-party stranger would be in the room with him and Child. However, Father did visit with Child previously in prison when Child was still in Mother's custody before DHS became involved. (N.T. 8/26/16, pg. 39). CUA also left her contact information with Father during her visit with him in jail. Father did not reach out to CUA to find out about Child. Father has not seen Child outside of prison since she was three months old. (N.T. 8/26/16, pgs. 12-16). Father admitted that he did not avail himself of any programs offered in prison, except enrollment in a drug program, upon which he did not elaborate, because he was preoccupied with studying his criminal case to represent himself. (N.T. 8/26/16, pgs. 45-46, 50-51). Although Father claimed that his uncle will give him employment and a home to live in if he is released, Father did not provide any detailed information or documentation to CUA. (N.T. 8/26/16, pgs. 40, 42). At best, Father is hopeful and speculating that he will be released on bail. Even if he is released, Father still has a trial scheduled for December 5, 2016, and will be on house arrest and electronic monitoring. (N.T. 8/26/16, pgs. 35-38, 41-44). Father has never been a primary caregiver for Child. Father admitted that he is unable to parent Child due to his present incarceration. (N.T. 8/26/16, pgs. 47-48). Over the six months prior to the filing of the termination

petition, Father failed to perform his parental duties by his failure to take affirmative steps to avail himself of prison programs, visit his Child, and contact DHS during his incarceration. Child has been in care for twenty months, while Father testified that he kept in contact with Child, Mother, and MGM, but did not learn about Child's coming into care until she had already been in care for over a year. The trial court found Father's explanations about his lack of knowledge hard to believe. Father's inability to perform his parental duties extends beyond the six months to the entire lifetime of the case. Father has an affirmative duty to place himself in a parenting position, which he has not done. Father cannot be passive and must take advantage of all opportunities to overcome all obstacles to be a parent. Father evidenced a settled purpose of relinquishing parental claims to Child by failing and refusing to perform his parental duties. Since these facts were demonstrated by clear and convincing evidence, the trial court did not err or abuse its discretion in terminating Father's parental rights under this section.

The trial court terminated Father's parental rights under 23 Pa. C. S. A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect, or refusal of the parent that causes the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. _Adoption of C.A.W._, 683 A.2d 911, 914 (Pa. Super. 1996).

Child was taken into DHS custody because Father was unable to provide essential parental care due to his incarceration. It was Father's own actions that placed him in jail. Father is not in a position to meet Child's safety and special needs and is unable to take immediate custody of Child. Although Father claims he did not know Child was in DHS custody, Father testified that he was having contact with Mother and MGM during his incarceration. Even after Father became aware that Child was in DHS custody, he had contact with MGM due to his cellmate being Child's maternal uncle. (N.T. 8/26/216, pgs. 48-49, 51, 55). Father's only SCP objectives were to make himself known, maintain contact with CUA after CUA's visit to the prison, and visit with his Child as offered by CUA. (N.T. 8/26/16, pgs. 12-14, 27-28, 30-31). Father did not complete any of his SCP objectives; CUA did not learn of Father's whereabouts until April 2016, at which time she

immediately reached out to Father at        . (N.T. 8/26/16, pgs. 26-27). Father has been incarcerated for the last three years; he was already incarcerated when Child came into care. (N.T. 8/26/16, pgs. 13, 35). Father has not seen Child outside of prison since she was three months old; he has never been a primary caregiver for Child. (N.T. 8/26/16, pgs. 13-14). When CUA asked Father if he wanted to have visits with Child, he said no. Father refused to have visits with Child. (N.T. 8/26/16, pgs. 12, 27-28). However, Father admitted visiting with Child before DHS involvement. (N.T. 8/26/16, pg. 39). Father has not availed himself of any programs in jail. Father prioritizes his own needs to represent himself in his criminal case as opposed to taking affirmative steps to overcome his obstacles to parent and maintain a relationship with his Child. (N.T. 8/26/16, pgs. 45-46, 50-51). Father claimed that neither Mother nor MGM informed him that Child was in DHS custody. (N.T. 8/26/16, pgs. 35-37). However, Father had contact with Mother and MGM via telephone for at least one full year before DHS found him in jail. Father was still awaiting a criminal trial, scheduled for December 5, 2016. If released on bail, Father admitted that he will be on house arrest and electronically monitored. Father is charged with robbery and possession of a firearm. (N.T. 8/26/16, pgs. 37-38, 41-44). Father is hopeful and speculating that he will be released on bail. Father claims that his uncle will provide him with a job and house, but he has not provided CUA with any documentation. (N.T. 8/26/16, pgs. 40-42). Father admitted that his is currently unable to parent Child due to his present incarceration. (N.T. 8/26/16, pgs. 47-48). Child has developmental delays and cardiac issues. Child attends numerous medical appointments and speech therapy at '     .. (N.T. 8/26/16, pgs. 11, 14). Due to his current incarceration, Father is unable to ensure that Child attends her medical appointments. The DHS witness was credible in her testimony.   Father is unable to remedy the causes of his repeated and continued incapacity to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. The conditions that brought Child into care cannot or will not be remedied by Father. Child needs permanency. Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was also proper.

After a finding of any grounds for termination under section (a), the court must, under 23 Pa. C. S. A. §2511(b), also consider what – if any – bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397

(Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* At 762-763. However under 23 Pa. C. S. A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Father has not seen Child outside of prison since she was three months old. (N.T. 8/26/16, pg. 12). In December 2014, when Child came into care, Father was already incarcerated. Father has been incarcerated for the last three years. (N.T. 8/26/16, pgs. 13, 35). Father claimed that he last saw Child in November 2014 when Mother brought her to the prison to visit. (N.T. 8/26/16, pgs. 39-40). After Mother stopped bringing Child to prison visits, Father claims to have some contact with Mother and Child via telephone. (N.T. 8/26/16, pgs. 49, 55). Occasional visits and phone calls are not enough to create a parental bond between Father and Child. Father does not have a healthy, beneficial relationship with Child. Father has never been a primary caregiver for Child. Father was offered visits with Child by CUA, but he refused to have visits in prison. (N.T. 8/26/16, pgs. 12, 35-37). CUA testified that Child's relationship with Father is like a stranger. (N.T. 8/26/16, pg. 11). Child looks to MGM for her daily love, care, and support. Child shares a loving and nurturing bond with MGM. MGM has taken Child on various trips to amusement parks, museums, and shopping trips. MGM ensures all of Child's medical needs are taken care of. (N.T. 8/26/16, pg. 11). CUA testified that Child would suffer emotional harm if she were to be removed from MGM's care. Child is bonded to MGM. (N.T. 8/26/16, pgs. 10-13). Child is in a safe and permanent home. The DHS witness was credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Father's parental rights would not destroy an existing beneficial relationship.

Father also alleges that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as

one of its primary purposes. _In the Interest of R.P. a Minor_, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply instructions received. _In re R.T._, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father admitted that he is not currently ready or able to parent Child. (N.T. 8/26/16, pgs. 47-48). At the time of the termination trial, Father was still incarcerated . Father was offered visits with Child and he declined. (N.T. 8/26/16, pgs. 12, 27-28). Father's only objectives were to make his whereabouts known to CUA, and keep in contact with CUA after meeting her. (N.T. 8/26/16, pgs. 30-31). Father has been incarcerated for the last three years and has never been a primary caregiver for Child. Father was already incarcerated when Child came into care. (N.T. 8/26/16, pgs. 13-14, 35). Father prioritizes his own needs to represent himself on his criminal case over visits with Child and availing himself of programs in jail. (N.T. 8/26/16, pgs. 45-46, 50-51). Father claimed to have daily contact with Mother, but did not know that Child was in DHS custody until the CUA worker visited him in prison in April 2016. (N.T. 8/26/16, pgs. 35-37, 48). Father is still awaiting a criminal trial; he is charged with robbery and possession of firearms. Father admitted that if he is released on bail, he will be on house arrest and electronically monitored. (N.T. 8/26/16, pgs. 37-38, 41-44). However, Father is speculating that he will be released on bail. Father has not provided any documentation to CUA as far as housing and employment if released. Father, again, speculates that his uncle will provide him a job and house to live in. (N.T. 8/26/16, pgs. 40-42). MGM ensures that all of Child's medical needs are taken care of. Child is bonded with MGM and would be emotionally harmed if removed from MGM's care. (N.T. 8/26/16, pgs. 10-13). Child is in a safe, permanent, and pre-adoptive home. Child needs permanency after twenty months in care. It is in Child's best interests to be adopted. (N.T. 8/26/16, pg. 10). At this time, Father is unable to provide for Child's physical, emotional, and medical needs. Father is unable to take custody of Child today since he is still in jail. The record established by clear and convincing evidence that the change of permanency goal from reunification to adoption was proper. The trial court did not err or abuse its discretion when it changed the goal to adoption.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights pursuant to 23 Pa. C. S. A. §2511 (a)(1), (2), and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Father's parental rights and change of goal to adoption were proper and should be affirmed.

By the court,

Joseph Fernandes, J.

## IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA
## FAMILY COURT DIVISION

In the Interest of T. N. R., a minor        :        CP-51-DP-0002710-2014
                                      :        CP-51-AP-0000362-2016
                                      :
                                      :        51-FN-002470-2014

APPEAL of: O. A. R., Father        :        848 EDA 2017

## Proof of Service

I hereby certify that this court is serving today, June 2, 2017, the enclosed Opinion upon the following persons:

Althea Udo-Inyang, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Attorney for DHS

Mary Cole, Esq.
1441 Sansom Street
Philadelphia, PA 19102
Attorney for Appellee/Child, T. N. R.

Tracey Chambers-Coleman, Esq.
2931 N. 22nd St. 2nd Floor
Philadelphia, PA 19132
Attorney for Appellant/Father, O. A. R.

Michael Mon, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

By: _____
Vijaya P. Singh
Law Clerk to the Hon. Joseph Fernandes
Philadelphia Family Court
1501 Arch Street, Suite 1431
Philadelphia, PA 19102
Telephone: (215) 686-2660